IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA MARTIN, ) | |
| ) | |
| Plaintiff; ) | |
| v. ) | |
| ) | |
| RAHM EMANUEL, in his official capacity as ) | No. 19-cv-1708 |
| Mayor of the City of Chicago; the CITY OF ) | |
| CHICAGO, an Illinois Municipal Corporation; ) | |
| LISA MORRISON BUTLER, in her official ) | **JURY DEMANDED** |
| capacity as Commissioner of the Chicago ) | |
| Department of Family and Support Services; and ) | |
| CHICAGO DEPARTMENT OF FAMILY AND ) | |
| SUPPORT SERVICES. ) | |
| ) | |
| Defendants. ) | |

## **COMPLAINT**

### INTRODUCTORY STATEMENT

1. This case is about the physical inaccessibility of homeless shelters funded by the City of Chicago through the Chicago Department of Family and Support Services ("DFSS"). Defendants denied Plaintiff Laura Martin access to their homeless shelters because Ms. Martin's disability prevents her from climbing stairs and carrying her own luggage. Defendants violated Ms. Martin's right to be free from discrimination on the basis of her disability by failing to design, fund, and operate Defendants' homeless shelter program in a manner that would provide equivalent services to Ms. Martin and other individuals with disabilities.

2. Ms. Martin brings this complaint under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*. (the "ADA"), and Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 791 *et seq*. (the "Rehabilitation Act"), and seeks: (1) a declaration that Defendants' conduct constitutes illegal discrimination against Ms. Martin based

on her disability; and (2) an injunction prohibiting Defendants' discriminatory conduct by ordering Defendants to make their homeless shelter program accessible to individuals with disabilities. Ms. Martin also seeks compensatory damages for Defendants' deliberate indifference to her right to be free from this discriminatory conduct.

## JURISDICTION

3. This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States) since they arise out of the protections provided in Section 504 of the Rehabilitation Act and Title II of the ADA.

4. Ms. Martin's claims for declaratory and other relief are authorized by 28 U.S.C. §§ 2201 and 2202.

5. This Court is the appropriate venue under 28 U.S.C. § 1391(b) in that the Defendants are subject to personal jurisdiction in this District and the events giving rise to this Complaint occurred in this District.

## PARTIES

6. Ms. Martin resides in Chicago, Illinois.

7. Ms. Martin is an individual with rheumatoid arthritis, a condition that significantly limits her mobility and generally requires her to use a cane or a walker to walk.

8. Ms. Martin is a qualified individual with a disability under the ADA and the Rehabilitation Act.

9. Defendant Rahm Emanuel is the Mayor of the City of Chicago. He is sued in his official capacity only.

10. Defendant City of Chicago is a municipal corporation with its principal offices located at City Hall, 121 N. LaSalle Street, Chicago, Illinois. The City of Chicago is a home rule

unit of local government under the 1970 Constitution of the State of Illinois and has the authority to promote the health, safety, and welfare of its inhabitants.

11. Defendant Lisa Morrison Butler is Commissioner of the City of Chicago's DFSS. She is sued in her official capacity only.

12. Defendant DFSS is a department of the City of Chicago and is primarily responsible for the City of Chicago's activities concerning emergency shelter for people experiencing homelessness.

13. Defendants' municipal operations constitute a "program or activity" within the meaning of § 504 of the Rehabilitation Act. 29 U.S.C. § 794(b)(1).

14. Defendants are each a "public entity" as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

## THE APPLICABLE LAWS

### A. The Americans with Disabilities Act

15. The ADA contains four substantive Titles that address discrimination in the areas of employment, public services, public accommodations and commercial facilities, and telecommunications. Ms. Martin brings this complaint under Title II of the ADA, which governs public services and protects individuals from discrimination by public entities on the basis of their disabilities.

16. A public entity is defined to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

17. The law governing Title II is found at 42 U.S.C. § 12101 *et seq*. and is codified at 28 C.F.R. § 35.101 *et seq*.

18. The ADA prohibits Defendants from discriminating against Ms. Martin or other individuals with disabilities based solely on their disabilities. 42 U.S.C. § 12132(a).

19. The ADA requires that Defendants, "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability – [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service . . . ." 28 C.F.R. § 35.130(b)(1)(i).

20. The ADA also prohibits Defendants from providing "a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . ." 28 C.F.R. § 35.130(b)(1)(ii).

21. Further, the ADA prohibits Defendants from providing "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result or gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

22. The ADA prohibits Defendants from "directly or through contractual or other arrangements, utiliz[ing] criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3)(ii).

23. The ADA requires Defendants to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

24. Subject to certain exceptions not applicable here, "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity . . . ." 28 C.F.R. § 35.149.

**B.     The Rehabilitation Act**

25.     Section 504 of the Rehabilitation Act prohibits discrimination by recipients of federal funding against otherwise qualified individuals on the basis of their disabilities. 29 U.S.C. § 794.

26.     The Rehabilitation Act and the ADA are functionally identical except that the Rehabilitation Act also requires proof of the receipt of federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

## STATEMENT OF FACTS

27.     Ms. Martin has rheumatoid arthritis. Because of this medical condition, she has not been able to climb stairs since 2008.

28.     Ms. Martin has a Housing Choice Voucher under Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437(f) ("HCV"). Her HCV provides a subsidy that allows Ms. Martin to rent an apartment even though her income would not otherwise afford her the ability to secure decent, safe housing.

29.     As a recipient of a HCV, Ms. Martin is responsible for finding a rental unit that meets housing quality standards and other Department of Housing and Urban Development standards. To meet these standards, a unit must undergo and pass an inspection. If a unit fails the first inspection, the landlord must make repairs to the unit before a second inspection is scheduled. Once the unit ultimately passes inspection, and before the HCV recipient moves into the apartment, the housing authority (*e.g.,* the Chicago Housing Authority (the "CHA")) and landlord must sign a contract and the landlord and HCV recipient must sign a lease. Each time an HCV recipient moves from one rental unit to another, that same process occurs.

30. In the fall of 2017, and while engaged in the process described in Paragraph 29, Ms. Martin stayed with a family member in the Chicago area. During this process, Ms. Martin encountered three landlords who appeared to reject her housing application because she was a HCV recipient.

31. Eventually, Ms. Martin found a landlord who would rent to her and arranged for the paperwork between the CHA and the landlord to be completed.

32. Seven days before the CHA and Ms. Martin's new landlord completed their paperwork, the family member Ms. Martin had been staying with had to move into a nursing home. That left Ms. Martin without a place to stay.

33. To access an emergency shelter bed in Chicago, a person experiencing homelessness must either call 311 or go to a police station or hospital, where the staff will call 311 on the person's behalf. Defendant DFSS is responsible for managing Chicago's homeless shelter system through funding and coordination of shelter placement. Defendant DFSS funds a delegate agency, Catholic Charities, to provide transportation, triage, and placement of individuals and families in open shelter beds across the city.

34. On or about October 6, 2017, Ms. Martin went to Rush University Medical Center ("Rush Hospital") to see her doctor. While there, she spoke with Rush Hospital's social worker ("Social Worker 1") and told Social Worker 1 that she did not have a place to stay.

35. Social Worker 1 told Ms. Martin that there was nothing Rush Hospital could do about her lack of housing but that Social Worker 1 could call the City of Chicago's 311 line to inquire about emergency shelter.

36. At approximately 11:00 am, Social Worker 1 dialed 311 and identified Ms. Martin as a homeless person in need of shelter. In response to the phone call, a driver from

Catholic Charities named Michael arrived at Rush Hospital at approximately 1:00 pm. The driver spoke with Ms. Martin about her disability and her luggage. After the discussion, the driver told Ms. Martin that the Pacific Garden Mission (the "PGM Shelter"), the largest homeless shelter in Chicago, would not take her because she was not able to transport herself and her luggage without assistance. The driver then told Ms. Martin to call back at 4:00 pm, because more shelters opened then.

37. After talking to the driver, Ms. Martin noticed a magazine in the hospital with an article on emergency housing. In that article, Ms. Martin found the name of Chris Robinson who was employed at Heartland Alliance. She found Mr. Robinson's phone number online and called him.

38. Mr. Robinson answered his phone and agreed to call numerous shelters for Ms. Martin. At the end of the phone call, Ms. Martin understood that Mr. Robinson was going to make the calls he promised to make.

39. At about 3:00 pm, Ms. Martin called Mr. Robinson. Mr. Robinson told Ms. Martin that he had confirmed a bed for her at Cornerstone Community Outreach (the "Cornerstone Shelter"), a shelter on Chicago's Northside.

40. Ms. Martin told Social Worker 1 that she had a bed waiting for her at the Cornerstone Shelter. Social Worker 1 called Catholic Charities back and asked them to drive Ms. Martin to the shelter.

41. The Catholic Charities van picked Ms. Martin up late that night and transported Ms. Martin to the Cornerstone Shelter at about 11:00 pm.

42. As Ms. Martin was receiving assistance exiting the van, a woman who appeared to be working for the Cornerstone Shelter approached her and said out loud, "she can't come in here."

43. Ms. Martin believed that the woman was speaking about her difficulty walking, so she told the woman that Mr. Robinson confirmed that there was an elevator at this facility. The woman from the Cornerstone Shelter expressed great frustration. She said that this problem happened frequently but that the elevator in the building had never worked from the time it had been installed.

44. The woman from the Cornerstone Shelter also asked the Catholic Charities' drivers how Ms. Martin would be expected to walk across the street to eat.

45. Ms. Martin cannot walk more than a block at a time because of her rheumatoid arthritis.

46. The Catholic Charities' drivers assisted Ms. Martin back into the van and drove her around the city. Ms. Martin eventually asked them to drop her off at a hostel for the night.

47. Ms. Martin spent the night of October 6, 2017 in a hostel. Ms. Martin had very little money and was attempting to save what she had for the security deposit and moving expenses for her new apartment. She could only afford to pay for one night at the hostel.

48. On Saturday October 7, 2017, Ms. Martin attended a discrimination training held by the CHA. While at the training, Ms. Martin called Julia Hodges of Catholic Charities. Ms. Hodges told Ms. Martin that she should return to Rush Hospital and that the hospital was required to keep her overnight.

49. After the training, the CHA paid for a van to drop Ms. Martin off at Rush Hospital.

50. Ms. Martin arrived at Rush Hospital at approximately 1:00 pm.

51. Ms. Martin presented herself at Rush Hospital's emergency room ("ER") desk and informed hospital staff that she was homeless. The Rush Hospital staff at the ER desk told Ms. Martin that Social Worker 1 was not in but that another social worker ("Social Worker 2") was there.

52. Social Worker 2 called 311. Catholic Charities sent a driver, who came into the hospital and said that all that was available was the PGM Shelter.

53. Ms. Martin told the driver that the PGM Shelter would not accept her because of her disability. The driver left, while Ms. Martin remained at the ER.

54. At about 3:30 pm, Ms. Martin checked herself into the hospital.

55. Ms. Martin continued to call Ms. Hodges. Ms. Hodges told Ms. Martin that Ms. Hodges had secured a bed for Ms. Martin at Sarah's Circle ("Sarah's Circle Shelter"), another shelter, but that it would not be available for two more days (until Monday, October 9, 2017), leaving Ms. Martin without a place to stay for two more nights. Ms. Hodges had a conversation with Whitney Shiner, an administrator at Rush Hospital, and tried to convince Ms. Shiner that Rush Hospital had to keep Ms. Martin until Monday, but Ms. Shiner told Ms. Hodges that Rush Hospital was refusing to do so.

56. At about 7:00 pm, a third Rush Hospital social worker ("Social Worker 3") came to Ms. Martin and told her that she had to leave as soon as she was released. Social Worker 3 then called 311.

57. From approximately 7:00 pm that night, Ms. Martin sat in the ER waiting room, waiting for Catholic Charities to send a van. The van did not arrive until approximately 10:45 am the next morning.

58. When the van arrived, this driver for Catholic Charities again told Ms. Martin that the only place they could take her was to the PGM Shelter.

59. When Ms. Martin explained to the driver that the PGM Shelter would not accept her, the driver told her to call back at 4:00 pm when more shelters would be open.

60. At this point, Ms. Martin decided to wheel herself in a wheelchair to an Au Bon Pain restaurant in Rush Hospital.

61. Ms. Martin sat down at the restaurant after buying food. About 20 minutes later, three Rush Hospital security guards approached her.

62. One of the three security guards told Ms. Martin that the security guards were there to escort her off the premises.

63. Ms. Martin informed the guards that she was a paying customer and that she wanted to finish her food before leaving. Ms. Martin eventually negotiated with the three security guards to allow her to remain for 10 additional minutes before leaving.

64. After the 10-minute period expired, one of the security guards approached Ms. Martin again and walked her to the exit of the hospital.

65. When Ms. Martin left the hospital, it was approximately noon on Sunday, October 8, 2017. As Ms. Martin was leaving, the security guard reached for his walkie-talkie and stated into it: "The suspect has left the building."

66. After leaving the hospital, Ms. Martin hailed a taxi to take her to John H. Stroger, Jr. Hospital of Cook County ("Stroger Hospital"), about a block away.

67. The taxi dropped Ms. Martin off at some kind of waiting room at Stroger Hospital.

68. Initially, Ms. Martin could not find anyone to talk to in this waiting room.

69. Around 3:00 or 4:00 pm, Ms. Martin finally found a social worker, but the social worker was in the process of leaving to go home.

70. At about 6:00 pm, a Stroger security guard approached Ms. Martin. He said to her, "How come you don't have a fucking house? I'm sick of all these people trying to stay here all night trying to get a free place to stay. You're not staying here tonight."

71. In response, Ms. Martin called Stroger Hospital's main phone line and asked to speak with the administrator in charge.

72. Because of Ms. Martin's phone call, an administrator came down and spoke with Ms. Martin. The administrator also told Ms. Martin that she was not allowed to spend the night. The administrator then left.

73. Right after the administrator left, Catholic Charities showed up to pick up some other people who were in need of emergency shelter.

74. The Catholic Charities' driver told Ms. Martin that she was not on their list but that she would be picked up in the morning.

75. The Catholic Charities' driver then approached the Stroger Hospital security guard and asked him if Ms. Martin could spend the night.

76. The request referenced in Paragraph 75 resulted in the return of the Stroger Hospital administrator along with another individual. The new individual told Ms. Martin that she could spend the night in the waiting room if she did not use the bathroom or videotape anyone. This individual told Ms. Martin that if she had to use a restroom, she had to go to a restroom a block and a half away.

77. Ms. Martin spent the night in the waiting room. Catholic Charities arrived at about 10:00 am the next morning, October 9, 2017, and took Ms. Martin to Sarah's Circle

Shelter, now three days after Ms. Martin had been turned away from the Cornerstone Shelter because of her inability to climb stairs or walk a block without assistance.

78. Sarah's Circle Shelter was able to admit Ms. Martin, who stayed there until she could move into her apartment on October 16, 2017.

79. On information and belief, Defendants fund the shelter providers in Chicago who provide emergency overnight housing in the City. The major exception is the PGM Shelter, which does not receive DFSS Homeless Grantee funding from Defendants.

80. On information and belief, Defendants provide funding to the Cornerstone Shelter to provide emergency overnight housing for Chicago residents experiencing homelessness.

81. On information and belief, Defendants fund Catholic Charities to operate a centralized system for responding to requests for emergency overnight shelter and for providing transportation to shelters.

82. On information and belief, Defendants fail to fund shelters in such a way that people with mobility needs, like Ms. Martin, have equal access to the City's emergency shelter services.

83. On information and belief, Defendants fail to operate the emergency shelter services in such a way that people with mobility needs, like Ms. Martin, have equal access to the City's emergency shelter services.

84. Ms. Martin faces a continuing threat of being denied access to Chicago's homeless shelters due to her disability. Although currently housed, Ms. Martin has a contractual right to stay in her apartment only through the end of her lease. If her lease is not renewed, she will again be forced to locate a landlord willing to accept her housing subsidy and will again face

the same chance of homelessness before the new landlord and housing authority complete the process to allow Ms. Martin to lease a new unit.

**COUNT I**
**DISCRIMINATION UNDER SECTION 504 OF THE REHABILITATION ACT**

85. Paragraphs 1 – 84 above are incorporated as if set forth fully herein.

86. Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals on the basis of their disabilities by recipients of federal funding. *See* 29 U.S.C. § 794.

87. Under Section 504, entities receiving federal financial assistance must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

88. Defendants receive federal funding and are subject to the requirements of Section 504.

89. Ms. Martin is "handicapped" within the meaning of Section 504.

90. Section 504 also prohibits Defendants from segregating individuals with disabilities and requires Defendants to ensure that people with disabilities receive services in the most integrated setting possible.

91. Defendants' decision to fund shelters in the current manner renders Defendants' homeless shelter program inaccessible to Ms. Martin and other individuals with mobility impairments on the basis of their disabilities.

92. Defendants' decision to operate a shelter program in the current manner renders Defendants' homeless shelter program inaccessible to Ms. Martin and other individuals with mobility impairments on the basis of their disabilities.

93. Defendants' acts and omissions constitute a violation of Ms. Martin's rights under Section 504. Defendants' conduct constitutes an ongoing and continuous violation of Section 504 and unless restrained and enjoined from doing so, Defendants will continue to violate Section 504. Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Ms. Martin has no adequate remedy at law.

94. Defendants' acts and omissions were made with deliberate indifference to Ms. Martin's right to be free from discrimination on the basis of her disability under Section 504.

## COUNT II
## DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

95. Paragraphs 1 – 84 above are incorporated as if set forth fully herein.

96. Title II of the ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. *See* 42 U.S.C. § 12132.

97. Under the ADA, public entities must provide reasonable modifications when a policy, practice, or procedure discriminates on the basis of disability. Public entities must also make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

98. The ADA prohibits Defendants from segregating individuals with disabilities.

99. Defendants are public entities subject to the requirements of the ADA.

100. Ms. Martin is a qualified individual with a disability within the meaning of the ADA.

101. Defendants' decision to fund shelters in the current manner renders Defendants' homeless shelter program inaccessible to Ms. Martin and other individuals with mobility impairments on the basis of their disabilities.

102. Defendants' decision to operate a shelter program in the current manner renders Defendants' homeless shelter program inaccessible to Ms. Martin and other individuals with mobility impairments on the basis of their disabilities.

103. Defendants' acts and omissions constitute a violation of Ms. Martin's rights under the ADA. Defendants' conduct constitutes an ongoing and continuous violation of the ADA and unless restrained and enjoined from doing so, Defendants will continue to violate the ADA. Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Ms. Martin has no adequate remedy at law.

104. Defendants' acts and omissions were made with deliberate indifference to Ms. Martin's right to be free from discrimination on the basis of her disability under the ADA.

## RELIEF SOUGHT

WHEREFORE, Plaintiff Laura Martin prays that this Court:

A. Declare that Defendants' operation of its emergency shelter program violates the ADA and the Rehabilitation Act by failing to make the emergency shelter program accessible to Ms. Martin and others with mobility impairments;

B. Declare that Defendants' choices in funding partners in its emergency shelter program violate the ADA and the Rehabilitation Act by failing to provide a system that is accessible to Ms. Martin and others with mobility impairments;

C. Enter a preliminary and permanent injunction against Defendants, ordering them to:

    1. Operate their emergency shelter program so that it is accessible to Ms. Martin and others with mobility impairments; and

      2.      Direct funding to partner organizations in such a way that the emergency shelter program is accessible to Ms. Martin and others with mobility impairments;

D.      Award Ms. Martin compensatory damages in an amount to be proven at trial;

E.      Award Ms. Martin reasonable costs and attorneys' fees; and

F.      Grant such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff Laura Martin demands a jury trial on all issues properly triable by a jury.

Dated: March 11, 2019

                                    Respectfully Submitted,

                                    **LAURA MARTIN**,

                                    By:  /s/ Robert N. Hermes
                                            By One of Her Attorneys

Robert N. Hermes
Andrew D. Shapiro
**Porter, Wright, Morris & Arthur LLP**
321 North Clark Street, Suite 400
Chicago, Illinois 60654
Phone: (312) 756-8500
Fax: (312) 873.4373
rhermes@porterwright.com
ashapiro@porterwright.com

Charles R. Petrof
Kenneth M. Walden
Mary E. Rosenberg
**Access Living of Metropolitan Chicago**
115 W. Chicago Ave.
Chicago, Illinois 60654
Phone: (312) 640-2124
Fax: (312) 640-2139
TTY: (312) 640-2169
cpetrof@accessliving.org
kwalden@accessliving.org
mrosenberg@accessliving.org

Patricia Nix-Hodes
Diane O'Connell
Tanya Gassenheimer
**Chicago Coalition for the Homeless**
70 East Lake Street, Suite 720
Chicago, Illinois 60601
Phone: (312) 641-4140
Fax: (312) 641-4144
patricia@chicagohomeless.org
diane@chicagohomeless.org
tanya@chicagohomeless.org