IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA MARTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 19 CV 1708 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| RAHM EMMANUEL, ) | |
| THE CITY OF CHICAGO, ) | |
| LISA MORRISON BUTLER, and ) | |
| CHICAGO DEPARTMENT OF ) | |
| FAMILY AND SUPPORT SERVICES, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Laura Martin has rheumatoid arthritis. She walks with a cane and cannot go up or down stairs. When she lost her home, she called the City of Chicago's emergency homeless shelter line. She was unable to access a shelter for three nights. Two shelters allegedly denied her access because of her mobility limitations: one refused to take people who needed help moving their luggage; the other had a broken elevator. She ended up spending one night in a hostel and two nights in hospital waiting rooms. She eventually moved into an apartment that she used a housing voucher to secure.

Plaintiff sued the City of Chicago for discriminating against people with disabilities, which the Rehabilitation Act and the Americans with Disabilities Act forbid. 29 U.S.C. § 794 et seq.; 42 U.S.C. § 12131 et seq. She seeks declaratory, compensatory, and injunctive relief. The City moves to dismiss, arguing that: (1) plaintiff lacks Article III standing for injunctive relief

because she fails to allege an imminent injury; (2) plaintiff fails to state claims under the Rehabilitation Act and Americans with Disabilities Act because she fails to allege that the City's homeless shelter system disparately impacts people with disabilities; and (3) plaintiff cannot recover damages because she fails to allege that the City discriminated against her intentionally.

The court agrees that plaintiff lacks standing for injunctive relief: she now lives in an apartment and faces no imminent threat of becoming homeless and facing discrimination again. Plaintiff has, however, plausibly alleged a disparate impact on people with disabilities. The City argues that the analysis should exclude a shelter that receives no City funding. But the question is whether that shelter—Pacific Garden Mission—is part of the City's services, programs, or activities. Plaintiff's allegations raise that inference: the City refers and transports people to Pacific Garden. Plaintiff has also plausibly alleged that the City intentionally discriminates against people with disabilities. Intentional discrimination is not discriminatory animus; it is deliberate indifference. Plaintiff alleges that the largest shelter in Chicago is inaccessible and that another shelter—Cornerstone Community Outreach—has an elevator that has never been fixed. Those allegations raise an inference of deliberate indifference: the City knows that its shelters are disproportionately likely to turn away people with disabilities, and the City has nonetheless failed to fix that disparity.

## **BACKGROUND**

Because the City challenges the legal sufficiency of the complaint's allegations, the court takes those allegations as true. Firestone Financial Corp. v. Meyer, 796 F.3d 822, 826 (7th Cir. 2015); Silha v. ACT, Inc., 807 F.3d 169, 173–74 (7th Cir. 2015).

The City funds most of the shelters in Chicago that provide emergency housing. To access a shelter bed, a homeless person must call 3-1-1 or ask hospital or police station staff to call

3-1-1 for them. The City funds a delegate agency to coordinate shelter placement. That agency, Catholic Charities, responds to shelter requests and transports people to shelters.

Plaintiff Laura Martin tried to use the City's homeless shelter system. She has rheumatoid arthritis, which limits her mobility. She needs a cane or a walker to walk and cannot go up or down stairs. She has a Housing Choice Voucher under Section 8 of the Housing Act, 42 U.S.C. § 1437(f). Her Section 8 voucher lets her rent an apartment that she otherwise could not afford.

In fall 2017, plaintiff found a landlord who would rent to her. Before her new landlord and the Chicago Housing Authority completed the paperwork, the family member with whom plaintiff had been living moved into a nursing home. Plaintiff had no place to stay.

**Day 1.** On October 6, 2017, plaintiff went to Rush University Medical Center. She told a social worker that she had no place to stay. The social worker called 3-1-1. A driver from Catholic Charities came. The driver told plaintiff that the only available shelter, Pacific Garden Mission, would not take her because she needed help to transport herself and her luggage. Pacific Garden is the largest homeless shelter in Chicago; it receives no City funding. The driver told plaintiff to call back later because more shelters would be open then.

Still at the hospital, plaintiff called an organization named "Heartland Alliance." A Heartland Alliance employee told plaintiff that he had confirmed a bed for her at Cornerstone Community Outreach, a City-funded shelter. Plaintiff told a social worker the good news. The social worker called Catholic Charities and asked them to take plaintiff to Cornerstone.

Plaintiff arrived at 11:00 p.m. As plaintiff got out of the van, a woman who appeared to work for Cornerstone approached and said, "She can't come in here." Plaintiff believed that the Cornerstone employee was talking about plaintiff's difficulty walking. Plaintiff said that the Heartland Alliance employee had confirmed that Cornerstone had an elevator. The Cornerstone

3

employee expressed great frustration. She said that this problem happened frequently—the elevator had never worked since it had been installed. The Cornerstone employee asked the Catholic Charities drivers how plaintiff would be expected to walk across the street to eat. Plaintiff's arthritis prevents her from walking more than a block at a time.

Plaintiff asked the drivers to drop her off at a hostel. She stayed there for a night. That was all she could afford—she was saving for moving expenses and the security deposit for her new apartment.

**Day 2.** Plaintiff arrived at Rush Hospital the next afternoon. She told the hospital staff that she was homeless. A social worker called 3-1-1. A driver from Catholic Charities came and said that the only available shelter was Pacific Garden Mission. Plaintiff said that Pacific Garden would not take her because of her disability. The driver left. Plaintiff stayed in the emergency room and called a Catholic Charities employee. That employee told plaintiff that there was a bed for her at Sarah's Circle, another shelter, but that it would not be available for another two days.

That evening, a hospital social worker came and told plaintiff that she had to leave when she was released from the emergency room. The social worker called 3-1-1. Plaintiff waited for Catholic Charities to send a van.

**Day 3.** Catholic Charities arrived the next morning. The driver told plaintiff that the only place that they could take her was Pacific Garden. When plaintiff said that Pacific Garden would not take her, the driver said to call back later, when more shelters would be open.

Plaintiff took a taxi to Stroger Hospital. When Catholic Charities came to pick up other people who needed shelter, the driver told plaintiff that they would pick her up in the morning. She spent the night in the waiting room.

**Day 4 – present.** Catholic Charities arrived the next morning and took plaintiff to Sarah's Circle. Plaintiff stayed for a week before moving into her apartment. She has a contractual right to stay there until the end of her lease. If her lease is not renewed, she will need to find a landlord willing to accept her Section 8 housing voucher.

## DISCUSSION

The City moves to dismiss plaintiff's claims. A plaintiff's claim avoids dismissal if the court can plausibly infer that the defendant is liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court takes the facts alleged in the complaint as true and draws reasonable inferences in the plaintiff's favor. Id. When the defendant argues that the allegations are legally insufficient for Article III standing, the test is the same: the allegations, taken as true, must plausibly give rise to standing. Silha, 807 F.3d at 173–74 (7th Cir. 2015).

The City argues that: (1) plaintiff lacks Article III standing for injunctive relief because she fails to allege an imminent injury; (2) plaintiff fails to state claims under the Rehabilitation Act and Americans with Disabilities Act because she fails to allege that the City's homeless shelter system disparately impacts people with disabilities; and (3) plaintiff cannot recover damages because she fails to allege that the City discriminated against her intentionally.

### 1    Article III standing for injunctive relief

Article III of the United States Constitution grants federal courts the power to decide "Cases" and "Controversies." The "core component" of a case is standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). A plaintiff must have standing for each type of relief she seeks. Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009). To have standing for injunctive relief, a plaintiff must show that: (1) she is threatened by an imminent injury in fact;

(2) the injury is fairly traceable to the conduct she seeks to enjoin; and (3) a favorable judicial decision would likely redress her injury. Lujan, 504 U.S. at 560–61. The City challenges the first requirement. It argues that plaintiff faces no imminent injury because she is no longer homeless.

Plaintiff lacks Article III standing for injunctive relief. The homeless shelter system that she alleges is discriminatory does not imminently threaten her with an injury in fact: she has an apartment and the right to stay until her lease ends. It is true that her landlord might refuse to renew her lease and that she might have trouble finding a new landlord willing to honor her Section 8 housing voucher. And even a willing landlord might fail to timely complete plaintiff's Section 8 paperwork. She might then become homeless again and face the same discrimination that forced her into hostels and hospital waiting rooms.

All that is possible. Yet the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." Clapper v. Amnesty International USA, 568 U.S. 398, 409 (2013) (emphasis in original; alteration and quotation marks omitted). No doubt plaintiff is more likely than a rich person to become homeless and suffer discrimination again. But such injuries are only possible, not certainly impending. She lacks standing for injunctive relief.

The cases on which plaintiff relies concern past injuries and mootness—issues that are not disputed here. Fortyune is the exception. Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1078 (9th Cir. 2004). The Ninth Circuit in Fortyune affirmed an injunction against a theater that discriminated against customers in wheelchairs. Id. The court reasoned that Mr. Fortyune, a quadriplegic, faced an immediate threat of future injury from: (1) the theater's written policy that denied wheelchair-bound patrons seating opportunities "equal to that enjoyed by ambulatory

6

patrons"; and (2) "the frequency with which Fortyune continues to attend the Theater"—three or four times a week. Id. at 1081–82, 1079.

Both those factors—a written, discriminatory policy, and continuing plans to go to the theater despite the discrimination—brought about a "real and immediate threat of repeated injury." Id. at 1081, quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974). Neither factor is present here. Plaintiff alleges not a policy to discriminate, but a policy the effects of which are discriminatory. She alleges not that she is homeless and seeks a shelter, but that she might again become homeless in the future. Imminence "is concededly a somewhat elastic concept," but the mere possibility that plaintiff might one day again lose her home and again suffer discrimination is "too speculative" to satisfy Article III. Clapper, 568 U.S. at 409.

## 2  Disparate impact on people with disabilities

Next, the City argues that plaintiff has failed to state claims under the Rehabilitation Act and Americans With Disabilities Act. Because the provisions and regulations of the two statutes are "materially identical," Steimel v. Wernert, 823 F.3d 902, 909 (7th Cir. 2016), courts "construe and apply them in a consistent manner." Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 607 (7th Cir. 2004).

Under either statute, a defendant is liable for discriminating against people with disabilities when the defendant: (1) intentionally discriminates based on a person's disability; (2) refuses to provide a reasonable modification to a person with a disability; or (3) carries out a policy that disparately impacts people with disabilities. Washington v. Indiana High School Athletic Association, Inc., 181 F.3d 840, 847 (7th Cir. 1999). The parties agree that plaintiff purports to allege only the third theory: disparate impact on people with disabilities.

7

Plaintiff's allegations raise a plausible inference that the City's homeless shelter system disparately impacts people with disabilities. The City does not dispute that being denied access to two shelters based on a disability raises an inference of disparate impact. Instead, the City argues that: (1) Pacific Garden Mission should be excluded from the disparate impact analysis because it receives no City funding; and (2) after excluding Pacific Garden, plaintiff fails to state a discrimination claim because she alleges only that one shelter denied her access based on her disability—and the City has no obligation to make every single shelter accessible.

The City's premise is wrong. The question is not whether Pacific Garden receives City funding; it is whether Pacific Garden provides benefits that are part of the City's "services, programs, or activities." 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). The City must comply with the Rehabilitation Act and Americans With Disabilities Act when it "engage[s] in a true joint endeavor" with a private entity—or when it takes actions that are "the result of a close relationship with a private actor." Ashby v. Warrick County School Corporation, 908 F.3d 225, 232–33 (7th Cir. 2018) (adopting an interpretation set forth in an amicus brief submitted by the United States Department of Justice).

As alleged in the complaint, Pacific Garden provides benefits that are part of the City's services, programs, or activities. The City refers people to Pacific Garden when they call the City's shelter line, and the City takes people to Pacific Garden through Catholic Charities, a City subcontractor. These allegations raise an inference that the City and Pacific Garden are engaged in a joint venture or that the City's acts are the result of a close relationship with Pacific Garden.

**3      Deliberate indifference to people with disabilities**

The City's final challenge is to plaintiff's claim to compensatory damages. Under the Rehabilitation Act and Americans with Disabilities Act, a plaintiff seeking damages must show intentional discrimination. CTL ex rel. Trebatoski v. Ashland School District, 743 F.3d 524, 528 n.4 (7th Cir. 2014). Intentional discrimination does not mean discrimination motivated by hostility or contempt for people with disabilities. It means deliberate indifference. Lacy v. Cook County, 897 F.3d 847, 862–63 (7th Cir. 2018). A defendant is deliberately indifferent when it: (1) knows that a harm to a federally protected right is substantially likely; and (2) fails to act on that likelihood. Id. at 863.

Plaintiff's allegations raise an inference that the City is deliberately indifferent to people with disabilities. Plaintiff alleges that: (1) Chicago's largest homeless shelter (Pacific Garden Mission) is inaccessible because it refuses to take people who cannot carry their own luggage; and (2) a shelter that purports to be accessible (Cornerstone Community Outreach) has an elevator that does not and never has worked. The court reasonably infers that the City knows about the conditions of the shelters with which it coordinates. If the City knows that its largest shelter is inaccessible, it should ensure that its smaller, accessible shelters are, in fact, accessible—or at least fix their accessibility problems promptly. The City's failure to do so gives rise to a plausible inference that the City knows that people with disabilities are unable to access shelters, but cannot be bothered to act on that knowledge.

The evidence might ultimately show that plaintiff's troubles were caused by mere negligence or bureaucratic inaction. Neither would show deliberate indifference. See S.H. ex rel. Durrell v. Lower Merion School District, 729 F.3d 248, 263 (3d Cir. 2013). But plaintiff's allegations "present a story" of deliberate indifference "that holds together," even if that story

does not describe "what 'really' went on" in her case. <u>Swanson v. Citibank, N.A.</u>, 614 F.3d 400, 404 (7th Cir. 2010). That is enough for her damages claim to survive a motion to dismiss.

## **CONCLUSION**

Defendant City of Chicago's motion to dismiss (Doc. 14) is granted in part. The court holds that plaintiff Laura Martin lacks Article III standing for injunctive relief. And because plaintiff does not object, the court dismisses all defendants except the City. The City's motion to dismiss is otherwise denied.

The City must answer the complaint on or before September 20, 2019. The parties are directed file a joint status report using this court's form on or before September 24, 2019. This matter is set for a report on status on October 1, 2019, at 9:00 a.m.

**ENTER:** **August 27, 2019**

**Robert W. Gettleman**
**United States District Judge**